RECORD NO. 15-3032

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

For The District of Columbia Circuit

# UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

**v.**

# BRANDON LAUREYS,

*Defendant - Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

## CORRECTED BRIEF OF APPELLANT

———————

L. Barrett Boss
S. Rebecca Brodey
COZEN O'CONNOR
1200 19th Street, NW, 3rd Floor
Washington, DC  20036
(202) 912-4818

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES:

**Pursuant to D.C. Circuit Rule 28(a)(1), appellant hereby states as follows:**

### A. Parties and Amici

The parties below and in this Court are the appellant, Brandon Laureys, and the appellee, the United States of America.  There are no intervenors or amici, either in the district court or this court.

### B. Rulings Under Review

In this appeal, appellant challenges the ruling of the district court, the Honorable Royce C. Lamberth, denying Mr. Laureys' ineffective assistance of counsel claims pursuant to this Court's remand and under 28 U.S.C. § 2255.  The district court issued no published decisions in this case.

### C. Related Cases

This case has previously been before this Court.  This Court affirmed Mr. Laureys' conviction in a 2-1 decision on direct appeal but remanded the case to the district court to determine his ineffective assistance of counsel claim.  *United States v. Laureys*, 653 F.3d 27, 34 (D.C. Cir. 2011).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ....................................................1

CONSTITUTIONAL PROVISIONS AND STATUTES...........................2

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS ......................................................................4

      I.      BACKGROUND....................................................................4

            A.      Circumstances Leading to Mr. Laureys' Arrest and Indictment ..................................................................4

      II.     TRIAL .................................................................................8

            A.      Overview ..................................................................8

            B.      The Government's Case..........................................8

            C.      Mr. Laureys' Defense ............................................10

            D.      Verdict and Sentencing ..........................................14

      III.    APPEAL ..............................................................................14

      IV.    EVIDENTIARY HEARING ON REMAND .....................16

            A.      Overview ..................................................................16

B.   Failure to Call Dr. Berlin Constituted Ineffective
     Assistance of Counsel ...........................................................17

     1.   Dr. Berlin's Testimony ...................................................23

     2.   The Prejudicial Effect of the Failure to Call Dr.
          Berlin ...............................................................................28

C.   Ineffectiveness for Failure to Obtain Corroborating
     Evidence ................................................................................30

D.   Ineffectiveness for Failure to Object to the Improper Jury
     Instruction ............................................................................32

V.   THE DISTRICT COURT'S OPINION ..............................................34

SUMMARY OF ARGUMENT ..............................................................35

ARGUMENT ..........................................................................................37

A.   Standard of Review & Legal Standard ................................37

B.   Trial counsel was ineffective in failing to call Dr. Berlin and in
     persisting in seeking to present a smoke-and-mirrors
     "diminished capacity" defense that lacked any support
     whatsoever ............................................................................39

     1.   Failure to Call Dr. Berlin Was Deficient ....................39

     2.   Prejudicial Effect of Failure to Call Dr. Berlin..........43

C.   Trial counsel was ineffective in failing to submit a shred of
     corroborating evidence about the meaning of a critical term,
     "perv out" ..............................................................................47

     1.   Failure to Call Dr. Butters Was Deficient...................47

     2.   Prejudicial Effect of Failure to Call Dr. Butters .......49

iii

D.    Trial counsel was ineffective in failing to object to the §
      2422(b) jury instruction where there was no controlling
      precedent in this Circuit and where the judge had expressly
      questioned the government's interpretation of the statute ................51

CONCLUSION .......................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Harrington v. Richter*,
    131 S. Ct. 770 (2011)......................................................................40

*People v. Harris*,
    Nos. 149872, 149873, 150042,
    2016 Mich. LEXIS 1125 (June 22, 2016) ....................................50

*Porter v. McCollum*,
    130 S. Ct. 447 (2009)......................................................................39

*State v. Rasabout*,
    2015 Utah 72, 356 P3d 1258 (2015) ...........................................50

*Strickland v. Washington*,
    466 U.S. 668 (1984)...............................................................38, 47

*United States v. Berk*,
    652 F.3d 132 (1st Cir. 2011).........................................................53

*United States v. Bolden*,
    514 F.2d 1301 (D.C. Cir. 1975)....................................................45

*United States v. Caudill*,
    2013 WL 610492, No. 12-10292 (5th Cir. Feb 19, 2013)............53

*United States v. Debango*,
    780 F.2d 81 (D.C. Cir. 1986)........................................................49

*United States v. Drew*,
    200 F.3d 871 (D.C. Cir. 2000)......................................................38

*\*Chief Authorities are Designated by an Asterisk.*

*United States v. Gwyn*,
    481 F.3d 849 (D.C. Cir. 2007)......................................................39

* *United States v. Hite*,
    769 F.3d 1154 (D.C. Cir. 2014)................................ 29, 34, 44, 51, 53, 54, 55

* *United States v. Laureys*,
    653 F.3d 27 (D.C. Cir. 2011)............................. 4, 5, 6, 14, 15, 16, 29, 43, 45

*United States v. Laureys*,
    No. 10-3047 (D.C. Cir. Aug. 26, 2011).........................................15

*United States v. Moore*,
    394 F.3d 925 (D.C. Cir. 2005)......................................................39

*United States v. Murrell*,
    368 F.3d 1283 (11th Cir. 2004)............................................15, 33, 37, 53, 54

*United States* v. *Nestor*,
    574 F.3d 159 (3d Cir. 2009) .........................................................53

*United States v. Shabban*,
    612 F.2d 693 (D.C. Cir. 2010)......................................................39

*United States v. Shabban*,
    782 F.3d 3 (D.C. Cir. 2015).........................................................38

*United States v. Spin-lock*,
    495 F.3d 1011 (8th Cir. 2007) ....................................................53

*United States v. Williams*,
    No. 13-3019, 2016 U.S. App. LEXIS 12551 (D.C. Cir. July 8, 2016) .......3, 8

*Wiggins v. Smith*,
    539 U.S. 510 (2003)...................................................................47

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. VI.....................................................................38, 55

## STATUTES

18 U.S.C. § 2260A .................................................................................2, 14

* 18 U.S.C. § 2422(b) ............................ 2, 14, 15, 32, 33, 34, 37, 51, 52, 53, 54, 55

* 18 U.S.C. § 2423(b) .......................................................................2, 3, 5, 14

18 U.S.C. § 3231 .....................................................................................1

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 2253(a) ..................................................................................1

28 U.S.C. § 2255 ........................................................... 1, 4, 16, 30, 32, 41, 55

## RULE

Fed. R. Crim. P. 29 ...............................................................................33, 55

## OTHER AUTHORITY

Corpus of Contemporary American English ...........................................................50

Diagnostic and Statistical Manual of Mental Disorders ....................20, 24

Leslie Kaufman, *For the Word on the Street, Courts Call Up an Online Witness*, N.Y. TIMES (May 20, 2013), http://www.nytimes.com/2013/05/21/business/media/urban-dictionary-finds-a-place-in-the-courtroom.html?_r=0........................................................................50

## JURISDICTIONAL STATEMENT

Appellant Brandon Laureys was charged in a superseding indictment that was returned on September 10, 2009. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. A final judgment of conviction was entered on May 27, 2010. Mr. Laureys filed a notice of appeal on June 1, 2010 and this Court heard his direct appeal pursuant to 28 U.S.C. § 1291.

This Court remanded Mr. Laureys' case to the district court for an evidentiary hearing on August 19, 2011. The district court then had jurisdiction pursuant to 18 U.S.C. § 3231 and 28 U.S.C. § 2255. A final judgment and Memorandum Opinion was issued on May 8, 2015. A notice of appeal was filed on May 18, 2015, and a certificate of appealability was issued by this Court on March 9, 2016.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(a).

## ISSUES PRESENTED FOR REVIEW

In a close case, which hinged on the defendant's intent, did the district court err in finding that the following actions (or inactions) by trial counsel did not constitute ineffective assistance of counsel requiring a new trial:

(a)     Trial counsel's failure to call a recognized expert who could have assisted the jury in placing the defendant's deviant activity into context;

(b)     Trial counsel's failure to develop corroborating evidence to support Mr. Laureys' assertion that his intent was to engage in sexual activity with an adult male, not a child;

(c)     Trial counsel's failure to object to an improper jury instruction, after the government's interpretation of the statute was expressly called into doubt by the judge?

## CONSTITUTIONAL PROVISIONS AND STATUTES

Applicable Constitutional provisions and statutes appear in the Addendum.

## STATEMENT OF THE CASE

The district court's Memorandum Opinion erroneously denied Mr. Laureys' claims that his trial counsel had made numerous grave errors and was therefore ineffective.  [#156].

Mr. Laureys' case dates back to November 14, 2008, when he was arrested following a one hour and thirty minute law enforcement sting operation.  [#1] (Complaint).  He was subsequently charged with one count of attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), one count of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b), and one count of enhanced penalties for registered sex offenders, in violation of 18 U.S.C. § 2260A.  [#18] (Superseding Indictment) (Sep. 19, 2009).

Mr. Laureys has maintained his innocence since Day One. His defense at trial was that he was seeking an adult homosexual tryst on the day of the arrest and any discussion of a minor was limited to fantasy. JA:106-07,[1] Tr.5/25/10:118-19. Part of Mr. Laureys' defense was that his use of the term "perv out" in his chat with the undercover agent conveyed his innocent intent. JA:67-68, Tr.10/29/09: 6-7; JA:184, Tr.5/25/10:197.

Although the original trial court indicated that, as a juror, it would have found Mr. Laureys not guilty of at least one of the charges (§ 2423(b)) (JA:246, Tr.5/25/10:287), Mr. Laureys was convicted at trial on all counts and sentenced to 20 years imprisonment, the statutory minimum sentence. [#37]. Mr. Laureys subsequently appealed his conviction arguing, *inter alia*, ineffective assistance of counsel. *See United States v. Laureys*, 653 F.3d 27 (D.C. Cir. 2011). His case was remanded for an evidentiary hearing to determine his ineffective assistance of counsel claims. *Id.* at 34.

On remand, Mr. Laureys argued that his counsel was ineffective for his failure to obtain critical mental health testimony. [#82] (Motion for New Trial). He also contended, under a 28 U.S.C. § 2255 claim, that trial counsel was ineffective for failing to (1) obtain corroborating evidence regarding the term "perv

---

[1] Relevant transcripts, exhibits and other documents are arranged in chronological order within the Joint Appendix. Citations to materials in the Joint Appendix will be to "JA:__."

3

out," and (2) object to an improper jury instruction. [#127] (§ 2255 Motion to Vacate). The district court denied all of his claims. [#157]. Mr. Laureys then filed a notice of appeal. [#159]. He next moved for a Certificate of Appealability as to the § 2255 claims, which the district court denied. [##162, 178]. This Court granted Mr. Laureys a Certificate of Appealability as to the § 2255 claims.

**STATEMENT OF FACTS**

**I.      BACKGROUND**

    **A.      Circumstances Leading to Mr. Laureys' Arrest and Indictment**

In November 2008, Mr. Laureys was 22 years old, lived at home with his parents, and was a bisexual, sex-addicted pedophile. He was (and is) mentally ill. JA:742, Berlin Report at 8.[2] Mr. Laureys has struggled with mental illness since he was 6 years old, when his brother died at childbirth. JA:741, Berlin Report at 7. At 8 years old, he was prescribed lithium. *Id.* Unfortunately Mr. Laureys' parents suffer from mental illness—his father is a diagnosed bipolar and his mother is a diagnosed schizophrenic who has been hospitalized on at least four occasions for attempted suicide. *Id.* Hence, Mr. Laureys' upbringing was chaotic, and he did

---

[2] Dr. Fred Berlin is a leading expert in sexual disorders, an associate professor in the Department of Psychiatry and Behavioral Sciences at the Johns Hopkins School of Medicine, founder of the Johns Hopkins Sexual Disorders Clinic, and a Director of the Johns Hopkins Sexual Behavior Consultation Unit. He prepared a report on Mr. Laureys that was filed as an exhibit to Mr. Laureys' Motion for New Trial. JA:735.

4

not receive adequate or consistent psychiatric treatment throughout his adolescence. *Id*.

At 20 years old, in September 2006, Mr. Laureys was caught in a sting operation where he traveled from Maryland to the District of Columbia with the intent to have sex with a purported 12-year-old girl, who was actually an undercover FBI agent. *Laureys*, 653 F.3d at 29-30. Mr. Laureys was arrested, charged with traveling to engage in illicit sex under 18 U.S.C. § 2423(b) and attempted enticement of a minor under the D.C. Code, and immediately pled guilty.[3] *Id*. He was sentenced to 36 months imprisonment with all but 8 months suspended. *Id*.

Upon his release from jail, Mr. Laureys was placed on supervised release and entered court-ordered counseling at Counseling and Forensic Services. *Id*.; *see also* JA:263-64, Tr.5/25/10:304-05. The counseling, however, was insufficient to effectively treat Mr. Laureys' near-overwhelming and constant sexual urges. JA:746, Berlin Report. To relieve these urges, Mr. Laureys frequently logged onto the internet in search of online sex. JA:736, Berlin Report at 2. Mr. Laureys engaged in unbridled online chats where he discussed fantasies of engaging in sex with women, men, dogs, and children. JA:496-97 (other chats).

---

[3] Mr. Laureys pled guilty only to the D.C. Code violation. As part of his plea agreement, the § 2423(b) charge was dismissed.

On November 14, 2008, 18 months after his release from jail, Mr. Laureys logged onto the internet and responded to an ad placed by Detective Timothy Palchak, in his undercover capacity, using the screenname "DaughterLoverMaryland." *Laureys*, 653 F.3d at 30. The ad was on the Incest Taboo website, a pay-to-access adult website, and stated, "DC/MD/VA, Hello, I'm 38, WM, into no limit fun. PM me on DaughterLover_Maryland on Yahoo. Discreet only." JA:134, Tr.5/25/10:146.

During the course of a 25-minute online conversation, the two men discussed their mutual sexual interest in young girls. JA:340-47. Detective Palchak, under the guise of "Jim P.," told Mr. Laureys that his girlfriend had a 9-year-old daughter that he had been "messing around with." JA:340. In what he consistently has maintained was fantasy, Mr. Laureys expressed excitement at this and asked for a picture of the girl. Detective Palchak responded with a picture of a fully-clothed young girl. JA:157, Tr.5/25/10:170. Mr. Laureys asked Detective Palchak to invite him over to "help with the little girl," "make her into a good little whore" and "teach her to take two [dildos] at once." JA:341-42.

Crucially, Mr. Laureys also asked Detective Palchak if he was free to "hang out and perv out together." JA:341. They discussed meeting for a beer or at a park before settling on meeting at "Jim P.""s apartment in D.C. JA:343. At no point

did they discuss whether the child would be present at the meeting. Instead the two men exchanged physical descriptions of each other. JA:345.

Mr. Laureys also explained during the chat that he would not be able to stay long as his girlfriend would be arriving shortly from out of town. JA:345. Palchak suggested that they meet at 5:45 p.m. that day and said that he would be leaving his office in five minutes and would meet Mr. Laureys when the detective got home. *Id*.

At no point did Detective Palchak say that his girlfriend or her daughter would be at the meeting. Nor did Mr. Laureys inquire about her presence - ever. At trial, Palchak claimed that he anticipated having a meeting beforehand, "before the girl ever gets involved." JA:189, Tr.5/25/10:202.

During two unrecorded subsequent telephone conversations, the men again exchanged statistics regarding height, weight, and physical appearance, as well as other logistical details. Detective Palchak conceded that no mention of the girl was made in either phone call. JA:161-62, Tr.5/25/10:174-75.

At around 5:30 p.m., Mr. Laureys arrived at the designated meeting place and was arrested.

7

## II.   TRIAL

### A.   Overview

Mr. Laureys' case went to trial on May 25, 2010, about 18 months after his arrest.  The trial lasted two days.

### B.   The Government's Case

The government's theory was that Mr. Laureys was a convicted sex offender who attempted to entice a minor to engage in illicit sex through his conversation with Jim P. and who traveled from Maryland to Washington, DC to engage in that illicit sex.  Its primary witness was Detective Palchak, who testified based on his extensive training and, as a practical matter, as an expert in "detecting child abuse and child sexual abuse" (JA:116) and as a fact witness to Mr. Laureys' first offense (Detective Palchak was the undercover agent in that case, too) and the instant one. JA:119-165.

Detective Palchak also purported to opine upon an array of psychosexual and psychological issues.[4]  He testified as to the meaning of "no limit fun,"  the

---

[4] Given this Court's recent decision in *United States v. Williams*, No. 13-3019, 2016 U.S. App. LEXIS 12551, at *58 (D.C. Cir. July 8, 2016), there is a question as to whether Palchak's lay opinion testimony should have been allowed. There, an FBI agent was improperly allowed to testify as a "two-hatted expert," offering both expert and lay testimony.   Like the agent in *Williams*, Detective Palchak's lay opinion could have been confused by the jury as "expert" opinion because it was elicited after he explained his experience in investigating on-line sex crimes—his years of experience, "1,000 hours" of training, "interviewing hundreds of children," teaching, and continuing education.  JA:116-17, Tr.5/25/10:128-29.

meaning of "discreet," the "suggestive" nature of his Yahoo! screen name, and the two types of responses that he receives to his feigned interest in children, "they're either going to go away and think you're disgusting or sick, or they're going to keep hanging on." JA:146, Tr.5/25/10:158.

Although he was never formally qualified as a psychological or sociological expert, the detective also testified as to the prevalence of individuals who are "solely into the fantasy" and engage in online sex chats about children. JA:150, Tr.5/25/10:162. He posited three different types of individuals who sexualize children: (1) those who like to masturbate while they are internet chatting about sex with children, (2) those who want to have phone sex and discuss sex about children, and (3) those who "want to meet and participate in activity with the child that you're having sex with." JA:150, Tr.5/25/10:162. His list conspicuously did not include a category of individuals who were seeking a "meet up" in-person to discuss sexualizing children—the precise category that Mr. Laureys would later claim to be a part of.

Detective Palchak claimed that Mr. Laureys could not have been engaging in only "fantasy" because when people are into fantasy, they supposedly "tell you right up front, I'm into fantasy, not realtime." JA:202, Tr.5/26/10:243. Palchak testified as to the alleged practice of showing child pornography before engaging in child sex abuse and the practice of "grooming" a child. JA:208, Tr.5/26/10:249.

9

In addition, the detective defined the term "perv out" as ostensibly being just a "general term that means to do sexual things, basically… [i]t's kind of general." JA:151, Tr.5/25/10:163.[5]  He claimed that Mr. Laureys' bald statement, "You want to do this now" meant that Laureys "was wanting to engage in sexual activity with this nine-year-old."  JA:160, Tr.5/25/10:173.

Turning to two unrecorded telephone calls, Palchak stated that in the first call, he asked Mr. Laureys if he was "discreet" and the two men exchanged personal descriptions.  JA:161-62, Tr.5/25/10:174-75.  Finally, he conceded that Mr. Laureys' computer had no child pornography on it.  JA:172, Tr.5/25/10:185.

### C.     Mr. Laureys' Defense

Mr. Laureys' defense was that he sought an adult homosexual encounter with Palchak and any reference he made to minors was strictly fantasy.

Mr. Laureys' actual trial defense, however, veered significantly from the defense that trial counsel had laid out at several pre-trial conferences.  Previously, trial counsel had stated that he intended to present a "diminished capacity" defense and call an expert who would testify that, "Mr. Laureys [was] incapable of formulating the specific intent to do the acts which he's alleged to have done; that he's an internet sexual compulsive and that… if he can't formulate the mens rea,

---

[5] Detective Palchak's testimony at trial differed from his assertion at Mr. Laureys' preliminary hearing that the term "perv out" had "no particular meaning[,]" JA:28-29, Tr.11/20/08:13-14, and Palchak, on cross examination, acknowledged this inconsistency.  JA:197-98, Tr.5/25/10:238-39.

then he can't have the specific intent to do what he was endeavoring to do."

JA:81, Tr.2/22/10:4.

Despite being repeatedly pressed by the trial judge, counsel could never muster any authoritative support for such a condition. Ultimately, trial counsel abandoned that defense. At trial, he called two witnesses—a former MPD officer[6] and Mr. Laureys.

Because trial counsel plainly failed to obtain an expert - as we shall discuss - trial counsel left himself with no choice but to call upon Mr. Laureys to (1) provide the clinical testimony that Dr. Berlin would have provided and (2) to rebut Detective Palchak's testimony. In doing so, Mr. Laureys provided his layperson's views on a number of issues such as the general purpose of online sex chats, the general practices of pedophiles, his own diagnosis of pedophilia, treatment for pedophilia, and the jargon of pedophiles. JA:261-318. But, as noted above, Mr. Laureys suffers from a serious mental illness. Unsurprisingly, his testimony was confused, lurid, and damaging.

Mr. Laureys testified as to his intentions on the day of his arrest as being designed to have a homosexual tryst. JA:260. Mr. Laureys also testified as to the purpose and monitoring of the Incest Taboo website, "[a]nd as Mr. Palchak said,

---

[6] Counsel called former police officer George Steel as a witness. Mr. Steel testified as to the police practices of recording telephone calls and the results of Craigslist searches that he conducted for the term "discreet." JA:253, Tr.5/25/10:294.

and I agree 100 percent, it's very, very strictly monitored, very very—there are strict rules… and they're very, very strict about enforcing them." JA:270, Tr.5/26/10:311. He added that the Incest Taboo website provided a "healthy and safe way" for pedophiles to indulge their fantasies, "if need be." JA:270, Tr.5/26/10:311.

As a rebuttal to Detective Palchak, Mr. Laureys referred to the different methods of fantasizing about children. Mr. Laureys explained that there are individuals who talk online about their fantasies, "and they're masturbating back and forth… [a]nd there's obviously no girl there, there's obviously no victim, but the fantasy is the attraction." JA:372, Tr.5/26/10:313.

Mr. Laureys also described telephonic roleplaying such as someone describing sexual relations with their "sister," even when they do not have a sister. JA:272, Tr.5/26/10:313. To explain this type of fairyland behavior to the jury, Mr. Laureys analogized these conversations to watching porn while having sex, having phone sex, or masturbating to a photograph of "Angelina Jolie." JA:273, Tr.5/26/10:314.

Mr. Laureys also defined "no limits" as meaning gang bangs, bestiality, necrophilia, scatophagia, and "water showers," or "urinating and defecating." JA:273-74, Tr.5/26/10:314-15.

To illustrate the fantasy subculture that he had engaged in, Mr. Laureys described other conversations with men.  He described his own homosexual encounters, JA:281, Tr.5/26/10:322, as well as his "fetish for wearing girl's undergarments."  JA:292, Tr.5/26/10:333.  When asked by trial counsel if he was "willing to perv out with both tops and bottoms," Mr. Laureys responded, "[p]referably bottoms.  I prefer to receive oral sex and to be a top, which I believe everyone here understands."  JA:293, Tr.5/26/10:334.

Continuing onwards, Mr. Laureys informed the jury of his "stats," describing himself as "5'11, 185, seven-and-a-half inch uncut."  JA:293, Tr.5/26/10:334.  He also described the different therapies he went through with Counseling and Forensic Services' sex offender treatment program.  He described his group therapy, cycles of abuse, victim empathy, ammonia aversion therapy, and his reluctance to take elevators or to use public urinals.  JA:294-97, Tr.5/26/10:335-38.

Mr. Laureys also testified about the content of his phone calls with Detective Palchak.  JA:298-300, Tr.5/26/10:339-341.  Like the detective, Mr. Laureys recalled confirming that the meeting would be "discreet."  *Id*.  Mr. Laureys also remembered telling Palchak that his "girlfriend doesn't even know that [he] still mess[es] with guys."  *Id*.  Mr. Laureys confirmed Detective Palchak's testimony

13

that there was no mention of the purported 9-year-old in either call. *Id*. Finally, he

testified as to his own sexual abuse as a child. JA:300-01, Tr.5/26/10:341-42.

### D.      Verdict and Sentencing

On May 27, 2010, the jury found Mr. Laureys guilty on all charges. He was

sentenced that same day to the statutory minimum sentence of 20 years

imprisonment—10 years for the 18 U.S.C. § 2422(b) violation, to be served

concurrently with 5 years for the 18 U.S.C. § 2423(b) violation and consecutively

to 10 years for the 18 U.S.C. § 2260A violation.

At sentencing, Mr. Laureys was devastated. He pleaded from the podium, "I

don't know what to do right now. I'm innocent and I'm never going to be guilty.

And I took the polygraphs and got the most evidence that I could get, and Mr.

Clennon said it wasn't a good idea to bring these witnesses in even though I

wanted to, and they couldn't get back in time anyway." JA:333, Tr.5/27/10PM:13.

## III.   APPEAL

Mr. Laureys appealed and argued that his trial counsel was ineffective for

failing to call Dr. Berlin and two other witnesses who could testify as to the term,

"perv out." *Laureys*, 653 F.3d at 33-34. On August 19, 2011, this Court remanded

the case for an evidentiary hearing to determine Mr. Laureys' ineffective assistance

of counsel claim. *Id.* at 34. Circuit Judge Brown dissented and stated, "[b]ecause

the [enticement] jury instruction was plainly erroneous and the evidence

14

insufficient as a matter of law, I would reverse Laureys'[] convictions and his

twenty-year prison sentence." *Id.* at 37 (Brown, J., dissenting).

Raising the improper § 2422(b) jury instruction, *sua sponte*, Judge Brown

parsed the statute and found that the jury instruction "thwart[ed] the plain meaning

of *§ 2422(b)* by replacing the statutory object ('any individual who has not attained

the age of 18 years') with its opposite ('an adult')." *Id.* at 38.  She remarked that

the only circuit case that had applied § 2422(b) to attempts to persuade "an *adult* to

cause a child to engage in sexual activity" was on "weak footing." *Id*. (emphasis in

original) (citing *United States v. Murrell*, 368 F.3d 1283, 1287 (11th Cir. 2004)).

Under Judge Brown's analysis, § 2422(b) required "an attempt to bend the child-

victim's will," not the will of an adult intermediary. *Id.* at 40.

While the majority found that the jury instruction was not "plain error," it

did not disagree with Judge Brown. *Id.* at 32 ("[w]e need not wade into this

question of statutory interpretation because Laureys has not raised it").[7]  Judge

Brown closed her dissent by stating, "[t]his is a disturbing case.  Laureys'[] chat

with Detective Palchak and his testimony at trial demonstrate moral depravity, but

they do not meet the Government's burden to prove the requisite criminal intent."

*Id.* at 47.

---

[7] Mr. Laureys did raise the issue in a Petition for Rehearing or Rehearing En Banc
but that petition was denied, without an opinion.  *United States v. Laureys*, No. 10-
3047, slip op. at 1 (D.C. Cir. Aug. 26, 2011) (per curiam) (noting that "Judge
Brown would grant the petition").

15

## IV.  EVIDENTIARY HEARING ON REMAND

### A.    Overview

Following the remand, undersigned counsel was appointed to represent Mr. Laureys in an evidentiary hearing before the Honorable Royce C. Lamberth.[8] Through his Motion for New Trial, Motion to Vacate,[9] a two-day evidentiary hearing,[10] and his post-trial submissions Mr. Laureys argued that:

(a)    Trial counsel was ineffective for failing to obtain expert mental health testimony and for his subsequent substitution of expert testimony with that of Mr. Laureys, his palpably mentally ill client;

---

[8] Judge Robertson, the trial judge, had retired.

[9] Mr. Laureys initially filed a Motion for New Trial alleging ineffective assistance of counsel claims beyond what the D.C. Circuit's remand had called for, including the failure to object to the improper jury instruction.  [#82].  Because the remand was limited to ineffective assistance of counsel for failing to call Dr. Berlin and two other witnesses, the district court agreed to hear Mr. Laureys' additional claims at the evidentiary hearing only if they were raised through a Motion to Vacate under 28 U.S.C. § 2255.  [#127].  Mr. Laureys subsequently filed a Motion to Vacate, realleging the claims raised in his Motion for New Trial and arguing that, as part of the ineffective assistance of counsel claim set forth in his Motion for New Trial, trial counsel failed to obtain an additional expert opinion from Dr. Ronald Butters.  *Id*.

[10] An evidentiary hearing was held before Judge Lamberth on December 5, 2014 and December 16, 2014.  At that hearing, Mr. Laureys called Dr. Ronald Butters, a linguistics expert and the former head of linguistics at Duke University, and Dr. Fred Berlin.  JA:418, Tr.12/5/14:6; JA:511, Tr.12/16/14:5.  The government called trial counsel.  JA:633, Tr.12/16/14:127.

16

(b)     Trial counsel was ineffective for failing to obtain any

corroborating evidence as to the definition of the term, "perv out;" and

(c)     Trial counsel was ineffective for failing to object to a jury

instruction where the elements had been expressly called into question by the trial

judge.

## B.     Failure to Call Dr. Berlin Constituted Ineffective Assistance of Counsel

On remand, Mr. Laureys and the government expanded the record with

details regarding his trial counsel's efforts and communications with experts.

These filings revealed that trial counsel had initially intended to present a

comprehensive defense that included expert testimony from a mental health expert,

an "internet/sexual deviance" expert, and possible testimony from a counselor at

Counseling and Forensic Services.  JA:68, Tr.10/29/09:7.  Mr. Laureys argued that

trial counsel instead had communicated with Dr. Berlin in a way that precluded his

assisting with Mr. Laureys' case.

Mr. Laureys noted that trial counsel's missteps began at the outset of the

case.  Trial counsel, through his own internet research, developed a particular

mental health defense prior to ever consulting with Dr. Berlin.  JA:377, Trial

Counsel's Affidavit.  The defense that trial counsel developed was what he called a

"diminished capacity" defense and he made several representations to the court

about this defense.  As early as July 2009, in his request for CJA approval, trial

17

counsel stated that "[t]he basic question we are addressing is the actual (subjective) intent of my client when he engaged in on-line dialogue and subsequently traveled to the District from Maryland… [t]he results of the evaluation may be offered in evidence at trial in support of *a defense of diminished capacity*…" JA:394, Letter from Trial Counsel (emphasis added). He then obtained a voucher for psychological services so that Mr. Laureys could undergo a psychiatric evaluation by Dr. Fred Berlin. JA:62, Tr.8/10/09:3. Dr. Berlin examined Mr. Laureys on September 15, 2009.

At an October 29, 2009 hearing, trial counsel represented that his "focus" had been on exploring the issue of sexual compulsivity and internet addiction and the link between compulsivity and specific intent. JA:67, Tr.10/29/09:6. To provide counsel with sufficient time to prepare his defense and to obtain a medical expert opinion, the Court continued trial to February 16, 2010. JA:73, Tr.10/29/09:16.

The correspondence between trial counsel and Dr. Berlin between the October 2009 status conference and the February trial date was sparse, to say the least. On the day of the October 29th hearing, Dr. Berlin's office emailed trial counsel to ask if he had obtained a trial continuance. Trial counsel replied, "2/16/10 more later…." JA:365. The next written correspondence was not until January 28, 2010, when trial counsel wrote Dr. Berlin that trial had been set for

18

February 16th and that he would likely be called to testify on the next day or the following day.  JA:367.  Trial counsel added that he was going to attempt to continue the trial but that might not be possible.  *Id*.  Dr. Berlin's office replied two days later that the doctor could not review the material and prepare a written report in such a short period.  JA:368.

As might be expected under such confusing circumstances, no medical expert report was prepared by the expert in preparation for the February trial date. At a February 1, 2010 status conference, trial counsel requested a continuance and stated that the expert report had not yet been prepared.  Despite Dr. Berlin's letter stating only that no report could be prepared in time for trial, counsel led the court to believe that this significant expert testimony was forthcoming.  JA:76, Tr.2/1/10:4.  The trial court then set a status conference for February 22, 2010 to set a new trial date.

At that later hearing, trial counsel requested a date that would allow the defense "sufficient time to allow the psychiatrist in this matter to finish his analysis."  JA:79, Tr.2/22/10:12.  Counsel claimed he was hoping the medical expert would testify that "Mr. Laureys would be incapable of formulating the specific intent to do the acts which he's alleged to have done; that he's an internet sexual compulsive and that… if he can't formulate the mens rea, then he can't have the specific intent to do what he was endeavoring to do."  JA:81, Tr.2/22/10:4.

19

In sum, despite a record that shows no support whatsoever from Dr. Berlin for trial counsel's perhaps unique "diminished capacity" defense, trial counsel's in-court representations misleadingly suggested that he and Dr. Berlin were actively working on the defense.[11]  Trial counsel continued to insist that this was a viable defense, even when the trial court expressed extreme skepticism as to whether any expert support existed and whether in continuing the case, "we're waiting for Godot here."  JA:97, Tr.4/7/10:6.

A vital part of Mr. Laureys' argument on remand was that none of trial counsel's communications with Dr. Berlin suggested that Dr. Berlin was prepared to testify within the arbitrary parameters laid out by trial counsel.  JA:372.  Indeed, on March 15, 2010—as Judge Robertson had predicted—Dr. Berlin wrote counsel that he would not be able to prepare a report in time for trial and could not be of any additional help.  JA:372.  Dr. Berlin testified on remand that this letter was based on his understanding that trial counsel had wanted him to opine as to a

---

[11] When asked by the trial court if the diagnosis was in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, trial counsel replied that he "would have to defer to the doctor on that.  [He hadn't] looked it up with that much specificity."  JA:81, Tr.2/22/10:4.  Years later, at the evidentiary hearing, trial counsel claimed that he was trying to "persuade" the judge to believe there was a defense there.  He admitted that he "never had an expert opinion" to offer the trial court but "was presenting what [he] hoped [they] would be able to develop."  *Id.* To allow counsel sufficient time to obtain an expert medical opinion, the Court, again, continued trial to May 25, 2010.  JA:91, Tr.2/22/10:14.

diminished capacity defense.  JA:623, Tr.12/16/14:117.   Dr. Berlin explained that

he was unable to support that defense.  JA:521, Tr.12/16/14:15.

Despite Dr. Berlin's March 15, 2010, letter, trial counsel continued to

represent to Judge Robertson that an expert opinion supporting a diminished

capacity defense was being developed.  For instance, at an April 7, 2010 hearing,

trial counsel admitted that he still had not obtained the expert medical opinion.  He

confirmed that the diagnosis he was waiting on was, "internet sexual compulsive

and incapable of forming the requisite specific intent."  JA:94, Tr.4/7/10:3.  When

questioned by the court at that hearing as to the likelihood that such a diagnosis

even existed, counsel stated without elaboration that he had "seen enough writing

to convince [himself] that it's a real phenomenon…"  JA:95, Tr.4/7/10:4.  It is

undisputed that this did not come from Dr. Berlin.  Trial counsel later confirmed

(on remand) that the defense was based "at least in part on [his] own [i]nternet

research."  JA:658, Tr.12/16/14:152.

The trial court eventually gave counsel one week to produce a "letter,

affidavit, or other formal undertaking from this psychiatrist that he believes that

there is such a thing as internet sexual compulsive – or if that's not the right term,

whatever term he thinks is appropriate – and that a person having such a condition

may well be incapable of forming the requisite specific intent of the crime that's

charged here."  JA:103, Tr.4/7/10:12.

21

Following that April 7, 2010 hearing, trial counsel wrote Dr. Berlin to seek a report that would support a diminished capacity defense, "a potential conclusion that Mr. Laureys was incapable of forming the specific intent to entice a minor or to travel for such a purpose due to a sexual compulsivity disorder… This is not an insanity defense, but rather a diminished capacity defense."  JA:660.  On April 12, 2010, Dr. Berlin responded that he would be unable to assist Mr. Laureys' trial. JA:372.  Dr. Berlin testified on remand that this letter was a response to trial counsel's request for a return proffer that would support a diminished capacity defense.  JA:631, Tr.12/16/14:125.

Dr. Berlin further testified that he believed he had been retained by trial counsel to draft a report that would support a defense that Mr. Laureys "lacked the capacity to form the intent to commit the crimes with which he had been charged or at least was diminished in his capacity to form that intent."  JA:518, Tr.12/16/14:12.  Trial counsel, on the other hand, testified that he "do[es]n't really agree with the characterization" that he directed Dr. Berlin to any specific conclusion.  JA:641, Tr.12/16/14:135.  However, trial counsel's testimony confirmed that every written and oral representation he had made to the trial court and Dr. Berlin was to provide a mental health basis for trial counsel's "diminished capacity" defense.   Trial counsel also confirmed that he continued to seek that

22

diminished capacity defense despite Judge Robertson's repeated statements that he did not think such a defense was viable. JA:665, Tr.12/16/14:159.

Additionally, when asked by defense counsel if he had ever requested that Dr. Berlin opine upon the methods of distinguishing fantasy from reality, trial counsel could not testify that he had, saying only that he "may have made a request like that" when he originally talked to Dr. Berlin's office manager and asked for Dr. Berlin's rate sheet and resume. JA:664, Tr.12/16/14:158. Tellingly, trial counsel could not identify any written request to Dr. Berlin regarding his ability to opine upon the difference between fantasy and reality. JA:663-64, Tr.12/16/14:157-58.

Trial counsel further conceded that Mr. Laureys' testimony about the online chatting and fantasy subculture, telephone sex, and deviant sexual fantasies would have been far better addressed at trial by Dr. Berlin. JA:671, Tr.12/16/14:165.

### 1.    Dr. Berlin's Testimony

Dr. Berlin ultimately addressed these issues on remand through an expert report that Mr. Laureys submitted with his Motion for New Trial and through the doctor's expert testimony at the evidentiary hearing.

At the evidentiary hearing, Dr. Berlin offered clinical testimony that was similar to that of Mr. Laureys in important respects—that Mr. Laureys is a pedophile who seeks sexual gratification through online chats about deviant

23

fantasies—but the tone and language were far different.  JA:539-45, Tr.12/16/14:33-39.  Dr. Berlin testified as an expert that Mr. Laureys is not someone who is antisocial or whose character is logically flawed but is "clearly quite disturbed in terms of his sexual makeup."  JA:539, Tr.12/16/14:33.  He explained that under the well-recognized <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM"), pedophilia is a non-volitional condition which is characterized by sexual attraction to pre-pubescent children and some form of acting out that attraction.  JA:541, Tr.12/16/14:35.  As emphasized by Dr. Berlin, "acting out" often includes the type of online fantasizing in which Mr. Laureys engaged.  JA:544-45, Tr.12/16/14:38-39.

Dr. Berlin opined that there are "misconceptions" about pedophilia including "the biggest misconception… that many people seem to think that pedophilia is synonymous with child sexual abuse."  JA:543-44, Tr.12/16/14:37-38.  Dr. Berlin noted that the term "pedophilia" had been "demonized," but included "recurrent cravings about being sexual with a prepubescent child."  JA:540-41, Tr.12/16/14:34-35.  He explained that while pedophilia is non-volitional, individuals bear responsibility for seeking treatment for their pedophilia.  JA:542, Tr.12/16/14:36.

Dr. Berlin specifically addressed Mr. Laureys' sexual history, discussing his first offense, his online fantasy chats about children, and his sexualized chats about

24

children, masturbation and sexual activity with adult men and adult women. JA:537-38, Tr.12/16/14:31-32.  Dr. Berlin made clear that he was not providing a "mental health defense" but rather, providing information that he thought a jury would find useful when assessing Mr. Laureys' intent.  JA:617, Tr.12/16/14:111.

Dr. Berlin explained that a "guiding principle" is that the best predictor of future behavior is a past behavioral pattern and that "there's no evidence of a pattern of being sexual with children."  JA:554-55, Tr.12/16/14:48-49.  He emphasized the "pattern that is clear is that [Mr. Laureys] engaged in numerous conversations over the internet that were extremely sexual" but that he had not "seen any hard evidence that [Mr. Laureys had] ever been sexual with a prepubescent child."  JA:553-55, Tr.2/16/14:47-49.

During cross-examination, the government showed Dr. Berlin several chats between Mr. Laureys and other individuals, including a chat between Mr. Laureys and someome who claimed to be 15 years-old.  JA:588-89, Tr.12/16/14:82-83.  Dr. Berlin responded that those individuals' ages or identities had never been verified, but even if the one purported 15-year-old actually was that age, she would not be a "pre-pubescent child" and this would not be evidence of pedophilia.  JA:624-25, Tr.12/16/14:118-19.

Dr. Berlin provided additional pertinent testimony about the kinds of sexual fantasizing that takes place on the internet and how the internet facilitates certain

types of sexual behaviors, particularly for vulnerable individuals. JA:525-526, Tr.12/16/1419:21-20:4. He testified that there is a clinical term, "scatalogia," for individuals, such as Mr. Laureys, who become very aroused by talking about sexual activity on the internet. JA:527, Tr.12/16/14:21. Sometimes, such conversations "are an end in and of themselves, not a means to some other end, such as actually being with a child." *Id*. And some individuals are occasionally interested in meeting in person to engage in adult sexual activities while discussing these fantasies of sex with children. JA:529, Tr.12/16/14:23. Dr. Berlin made clear that distinguishing fantasies from actual intent on the internet "can often be very difficult." JA:536, Tr.12/16/14:30.

In addition, Dr. Berlin reviewed Mr. Laureys' chats with other individuals and testified that "the more outlandish something seems the more likely it would be fantasy," particularly when the message would be "disturbing… to most of us." JA:550, Tr.12/16/14:44. Nothing shown to him during his cross-exanimation by the government changed his opinion with regard to the fantasy subculture. JA:626, Tr.12/16/14:120.

With regard to Mr. Laureys' chat with Detective Palchak, Dr. Berlin testified that the question of whether or not Mr. Laureys believed a girl would actually be present at the meeting with the detective "is a difficult thing, in [his] opinion, to determine." JA:551, Tr.12/16/14:45. He stated that he could not "be confident" or

26

"be sure" whether Mr. Laureys was engaging in fantasy or reality.  JA:552, Tr.12/16/14:46.  But "simply by reading" the chat transcript between Mr. Laureys and Detective Palchak, he "would not know with any high degree of confidence" whether the two men were engaging in fantasy-chat or reality.  JA:528-29, Tr.12/16/14:22-23.

Dr. Berlin further noted that when Mr. Laureys and the detective discussed meeting at a bar, there was no indication in the chat that the girl would be present. JA:553, Tr.12/16/14:47.  When Mr. Laureys and the detective discussed meeting at the park, there was no indication in the chat that the girl would be present, either. JA:553, Tr.12/16/14:47.  And when Detective Palchak told Mr. Laureys he would be leaving work in five minutes and then going home to meet Mr. Laureys, he gave no indication that the girl would be at his home.  JA:553, Tr.12/16/14:47.

Given the evidence of record, Dr. Berlin opined that Mr. Laureys most likely had an interest in sexual activity with an adult male on the day of the offense. JA:533, Tr.12/16/14:27:18.  Dr. Berlin considered the exchange of physical characteristics in Mr. Laureys' chat as consistent with two men seeking a sexual encounter with each other.  JA:629, Tr.12/16/14:123.

Dr. Berlin also provided what could have served as rebuttal testimony to Detective Palchak's testimony.  When questioned about Detective Palchak's testimony regarding the categories of individuals who engage in internet sex, Dr.

Berlin testified that these "are not the only possibilities" and "far from the only possibilities that exist."  JA:546-47, Tr.12/16/14:40-41.  When questioned about Detective Palchak's averment that people who are into fantasy disclose it "right up front," (JA:202, Tr.5/26/10:243), Dr. Berlin testified that, to the contrary, he had seen "many examples… where one would have no idea it was fantasy until it is subsequently discovered that that had been the case."  JA:545-46, Tr.12/16/14:3940.

Finally, Dr. Berlin testified that "perv out" is a "general rubric that's used to talk about having kinky or unconventional-type of sexual activity" and that it is "often used in the gay community."  JA:558, Tr.12/16/14:52.

### 2.      The Prejudicial Effect of the Failure to Call Dr. Berlin

Mr. Laureys argued that he was severely prejudiced by trial counsel's failure to call Dr. Berlin—both because of the objective and clinical testimony that he could have provided but also because it would have limited any need to rely on Mr. Laureys' harmful testimony—a need occasioned solely by trial counsel's inattentiveness to his duties.

Mr. Laureys argued that as important as the information Dr. Berlin would have been able to relay to the jury is the prejudicial information that Dr. Berlin's testimony would have precluded—much of Mr. Laureys' own testimony.  The most damning evidence against Mr. Laureys, in a case where the facts were

described by Judge Robertson as "razor thin," was Mr. Laureys' testimony.  As

Circuit Judge Henderson noted, the damage that Mr. Laureys did to his own case

was "irremediable" and "[b]y testifying, Mr. Laureys was truly the author of his

own misfortune."  *Laureys*, 653 F.3d at 37, (Henderson, J., concurring in part,

dissenting in part).

Dr. Berlin's testimony, unlike Mr. Laureys' testimony, was measured,

scientific and authoritative.  Mr. Laureys submitted that Dr. Berlin's value in other

cases demonstrated his potential benefit to Mr. Laureys' trial.  As noted by the

D.C. Circuit in *United States v. Hite*, Dr. Berlin's general clinical testimony would

be helpful in explaining foreign concepts to the jury such as "sexual fantasy

involving children, particularly the kind that unfolds in the virtual realm of the

[i]nternet."  769 F.3d 1154, 1170 (D.C. Cir. 2014).

Mr. Laureys also invoked a district court case in the District of Columbia,

*United States v. Beauchamp-Perez*, 11-cr-310 (JDB), where Dr. Berlin's testimony

contributed to two hung juries.  [#153], Findings of Fact at 30.  At both

*Beauchamp-Perez* trials, Dr. Berlin testified as to (1) diagnostic criteria in

identifying pedophilia, (2) the nature of fantasy versus reality, (3) how the facts in

Mr. Beauchamp-Perez's case are viewed from a behavioral profiling perspective,

and (4) the definitions of slang terms used amongst an internet fantasy subculture.

*Id*.

29

## C.  Ineffectiveness for Failure to Obtain Corroborating Evidence

Pursuant to the § 2255 motion, Mr. Laureys also charged that his trial counsel was ineffective for not obtaining corroborating evidence regarding the term, "perv out."  Mr. Laureys has always contended that this term is indicative of a purely *adult* homosexual encounter that often involves discussing lurid fantasies and fetishes.  And trial counsel evidently agreed: at an October 2009 hearing, trial counsel said he would be able to lay expert testimony to the effect that "perv out" is a term used by adult male homosexuals to describe anticipated adult homosexual acts.  JA:67-68, Tr10/29/09:6-7.

The expanded record revealed that trial counsel had considered calling two witnesses—Frank Lombard and Tanner Stickney—to testify as to the meaning of the term, "perv out."  JA:387-89, Trial Counsel's Affidavit.  Trial counsel's affidavit explained (albeit hardly in a disinterested way) that his decision not to call these two witnesses was strategic, and therefore not ineffective.  *Id*.

Mr. Laureys, however, countered that there was other available corroborating evidence that trial counsel should have obtained.  Specifically, Mr. Laureys argues that trial counsel could have called Dr. Ronald Butters, a linguistics expert and the former head of linguistics at Duke University.

Mr. Laureys explained that, as shown at the evidentiary hearing, Dr. Butters could have corroborated the definition of the term "perv out" offered by Dr. Berlin.

Dr. Butters testified that the term has two basic meanings—one is to ogle and the other "describes the process of two adults, usually males, getting together in private to engage in sexual fantasies of various sorts, which could mean watching videos, it could mean telling each other lascivious stories… [it could include] [a]lmost anything that one could imagine that might be a sexual fetish or a sexual practice."  JA:430, Tr.12/5/14:18.

Dr. Butters further explained that this latter definition is the "default case" or "presumptive" definition for the term.  JA:430, Tr.12/5/14:18.  Dr. Butters stated that he discerned that the term is most commonly found in online chat groups where individuals are seeking sexual encounters. JA:431, Tr.12/5/14:19.

Dr. Butters also reviewed several chats in which Mr. Laureys used that term and concluded that, in every single instance, Mr. Laureys had used it in a manner that was consistent with the definition he ascertained.  *Id*.  Dr. Butters also testified that Mr. Laureys' use of the term in his chat with Detective Palchak was consistent with the definition he ascertained.  JA:437, Tr.12/5/14:25.

In addition to Dr. Butters' testimony, Mr. Laureys provided other corroborating evidence regarding the term "perv out."  He submitted five affidavits attesting to the meaning of the term "perv out" in a manner that is consistent with the definition ascertained by Dr. Butters and Dr. Berlin.  JA:503, Def. Ex. 1 from 12/5/14; *see also* [#82-12].  Mr. Laureys also provided excerpts from both his own

31

chats and the chats of Detective Palchak with other defendants where the term

"perv out" was used in a manner that is consistent with the definition ascertained

by Dr. Butters and Dr. Berlin.  JA:500, Def. Ex. 1 from 12/5/14.

The expanded record revealed that trial counsel had made no effort, other

than calling Mr. Laureys to testify, to corroborate the meaning of the term "perv

out."  JA:260-301, Tr.5/26/10:301-42.

**D.     Ineffectiveness for Failure to Object to the Improper Jury
        Instruction**

As another part of his § 2255 motion, Mr. Laureys charged that his counsel

was ineffective for his failure to object to the § 2422(b) (enticement) jury

instruction after Judge Robertson had expressed extreme hesitation about the

government's interpretation of the statute.  Mr. Laureys noted that Judge Robertson

had questioned the statute quite candidly before trial counsel's oral motion for

judgment of acquittal:

- "The way that language has to be parsed and chopped and
  sliced and diced in order to make everything fit is frankly quite
  disturbing to me."  JA:245, Tr.5/26/10:286.

- "I have made no secret in this case or past cases about my
  discomfort with this legislation, *or* with the way it is applied
  with sting operations; that it seems to me, always seems to me it

32

comes perilously close to entrapment."  JA:245, Tr.5/26/10:286

(emphasis added).

In his Rule 29 motion, trial counsel articulated his understanding of §

2422(b) as "agree[ing] with the *Murrell* decision in that having gone through an

intermediary, there's no attempt to persuade a minor, but that perhaps the attempt

comes from the inducement of the adult to persuade the minor to participate."

JA:239, Tr.5/26/10:280.  He argued, however, that "[m]erely agreeing with the

detective's suggestion that he join him in a sex act with a child is nothing more

than… preparation or planning" and that "[a]ll of the inducement comes from the

detective."  JA:239-40, Tr.5/26/10:280-81.

Trial counsel utterly failed to address the trial court's expressed skepticism

with the statute.  Ultimately a jury instruction reflecting the government's analysis

of the statute was filed with the Court.  That Jury Instruction read:

> "Direct Communication with a Minor is Unnecessary… [i]t is not a
> defense to [2422(b)] that the defendant did not directly communicate
> with the fictitious minor child.  **Direct communication with the
> child is unnecessary.**  Here it is alleged that the defendant
> communicated with an adult intermediary who claimed to have access
> to a fictitious child.  The government must only prove that the
> defendant believed that he was communicating with someone who
> could arrange for the child to engage in unlawful sexual activity."
> (emphasis in original).

JA:351.

Mr. Laureys contended before Judge Lamberth that the trial court's comments called the elements of the statute into question and that because the jury instruction encapsulates those elements, trial counsel should have objected to it.

Mr. Laureys also argued on remand that he was prejudiced by trial counsel's failure because of this Court's invalidation of the jury instruction in the intervening decision of *United States v. Hite*, 769 F.3d at 1170. *Hite* limits the scope of § 2422(b) by holding that a defendant's communications with an adult intermediary can be subject to prosecution under § 2422(b) only if the defendant's interaction with the intermediary was aimed at overcoming the minor's will. *Id*. Had trial counsel followed the trial judge's lead and objected to the improper jury instruction, Mr. Laureys' conviction under § 2422(b) would have been reversed. [#153], Findings of Fact.

## V.    THE DISTRICT COURT'S OPINION

On May 8, 2015, the district court issued a 13-page Memorandum Opinion ("Opinion") denying Mr. Laureys' claims.

**1.** In its Opinion, the district court found that trial counsel's failure to obtain a report from Dr. Berlin was due to "a combination of mutual misunderstandings and Dr. Berlin's exceptionally busy schedule." JA:730. The district court's opinion, however, failed to address Dr. Berlin's clear and well-corroborated testimony regarding his instruction from trial counsel.

**2.** In addition, the district court found that Dr. Berlin's testimony "would likely do Laureys more harm than good." JA:732. The court did not articulate any reasoning for this finding but used it to justify its holding that counsel's failure to obtain Dr. Berlin's testimony was not prejudicial.

**3.** The district court found that trial counsel was not ineffective for his failure to obtain corroborating evidence regarding the term "perv out." JA:729-30. In looking at this corroborating evidence, the court addressed only Dr. Butters' testimony—without addressing the affidavits, other chats, or any other type of corroborating evidence that could have been introduced—and found that his research methods were not credible because his research was based primarily on an internet search rather than personal experience with the term "perv out." JA:729. Thus, it did not view his absence at Mr. Laureys' trial as prejudicial. JA:730.

**4.** The district court also found that trial counsel was not ineffective for not objecting to the jury instruction because that instruction, at the time, was still valid law. The district court noted that the "Constitution does not require defense counsel to be legal prognosticators." JA:728-729. The Opinion did not address Judge Robertson's concerns.

## SUMMARY OF ARGUMENT

The district court erred in denying relief to Mr. Laureys with regard to three issues:

35

1.     **Trial counsel's failure to call Dr. Berlin.**  There was no "miscommunication" between trial counsel and Dr. Berlin.  Trial counsel was clear that he wanted Dr. Berlin to support a so-called "diminished capacity" defense based on "internet sex addiction."  Thus, by so narrowly confining the inquiry, trial counsel failed to call Dr. Berlin as an expert who could have educated the jury on the nuances of pedophilia, internet fantasy chat, and the type of off-putting behavior engaged in by Mr. Laureys.  This lack of intellectual rigor effectively left Mr. Laureys with no defense.  Moreover, it crushed any opportunity to rebut Detective Palchak's injurious testimony.  This includes his statement that Mr. Laureys could not have been engaging in fantasy because he did not make that explicit during the chat.  Most significantly, trial counsel was forced to rely on Mr. Laureys, who is unqualified to testify as a mental health expert and who is plagued by his own mental illness, to fill in the blanks left by an absentee expert.   In this "razor thin" case, Dr. Berlin's testimony likely would have produced a different outcome.

2.     **Trial counsel's failure to obtain corroborating evidence regarding the term "perv out."**  Central to his defense, Mr. Laureys contended that his expressed desire to "perv out" with the detective had a specific meaning that communicated his intent was only to have a sexual tryst with "Jim."  As this is not a term in the general lexicon, the defense offered a well-credentialed and

recognized linguistic expert, Dr. Ronald Butters, to provide a definition of this
term based on its usage in Mr. Laureys' specific conversations as well as its
general usage by other individuals who are part of this subculture.

The district court's determination that Dr. Butters' proposed testimony was
"unreliable" ignores the fact that his methodology was consistent with that
accepted among linguistic experts and that the government conceded that Dr.
Butters was a qualified expert linguist.

**3.      Trial counsel's failure to object to the improper jury instruction.**

There can be no dispute that the jury instruction based on *Murrell* was improper
and invited a conviction for conduct that is not a crime under § 2422(b).  Trial
counsel was ineffective for failing to object to this instruction since there was no
controlling precedent in this Circuit and Judge Robertson had repeatedly voiced his
concern that the statute was being interpreted too broadly by the government.

**ARGUMENT**

**A.      Standard of Review & Legal Standard**

This court has recently reiterated the standard for reviewing claims of
ineffective assistance of counsel:

> "An appellant claiming ineffective assistance of counsel must show:
> (1) that counsel's performance was deficient and (2) 'that there is a
> reasonable probability that, but for counsel's unprofessional errors,
> the result of the proceeding would have been different.'  Although we
> review the district court's factual findings for clear error, the standard
> of review for a claim of ineffective assistance of counsel is unsettled

37

in this circuit. Such a claim presents mixed questions of law and fact, which are sometimes reviewed de novo and sometimes only for abuse of discretion. We have not yet decided which should apply because we have not yet confronted an ineffective assistance of counsel claim in which the standard made a difference. And we see no reason to select between the standards now, because Shabban's claim 'fails even under the more searching <u>de novo</u> standard.'"

*United States v. Shabban*, 782 F.3d 3, 7 (D.C. Cir. 2015) (citations omitted).

In the present case, because the district court's resolution of the issue relied on facts "not significantly in dispute," the review is solely an issue of law and should be reviewed de novo. *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000).

The lack of due diligence that went into Mr. Laureys' trial and consequent effective failure to raise any defense falls squarely within the standard for ineffective assistance of counsel established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). Central to a defendant's Sixth Amendment right to counsel, the Supreme Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 692-93. To gauge this benchmark, the Supreme Court adopted the two-prong test set forth above that must be met to prevail on a claim of ineffective assistance of counsel.

To establish deficiency, a defendant must show his "counsel's representation fell below an objective standard of reasonableness." *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (citation omitted); *United States v. Shabban*, 612 F.2d 693, 697 (D.C. Cir. 2010).  To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.  In the District of Columbia Circuit, "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *United States v. Gwyn*, 481 F.3d 849, 853 (D.C. Cir. 2007) citing *United States v. Moore*, 394 F.3d 925, 931 (D.C. Cir. 2005).

**B.     Trial counsel was ineffective in failing to call Dr. Berlin and in persisting in seeking to present a smoke-and-mirrors "diminished capacity" defense that lacked any support whatsoever.**

### 1.     Failure to Call Dr. Berlin Was Deficient

The district court found that trial counsel's failure to call Dr. Berlin was not ineffective because the failure to obtain Dr. Berlin's testimony was (1) "due to a combination of mutual misunderstandings and Dr. Berlin's exceptionally busy schedule" and (2) not prejudicial because it would "likely do Laureys more harm than good."  JA:730.

The district court never explained what it viewed as "mutual misunderstandings," but it is assumed that the district court found that Dr. Berlin misinterpreted trial counsel's instructions.  Trial counsel testified that he did not

intend to restrict the scope of Dr. Berlin's review or his potential testimony. JA:680, Tr.12/16/14:174. Dr. Berlin, on the other hand, testified that he understood trial counsel to be asking him for only a report that would support the specific defense of diminished capacity. JA:631, Tr.12/16/14:125.

Dr. Berlin's unimpeached account has the better of it. Because the documentary evidence presented at the evidentiary hearing and counsel's then-contemporaneous actions and statements so completely refuted trial counsel's self-serving declaration, there could have been no "misunderstanding."[12]

From the inception of the case, trial counsel was locked-in on a diminished capacity defense—both in his written submissions and his statements in open court. This is evident through his July 2009 request for CJA approval to hire an expert, his several representations to the court about the "diminished capacity" defense, his April 2010 letter to Dr. Berlin, and his own affidavit. Nowhere in the record did trial counsel ever suggest to Dr. Berlin or to the trial judge that he was seeking testimony on anything other than the ostensible "diminished capacity defense" based on a made-up diagnosis of internet sex addiction. The district court's Opinion fails to address any of this.

---

[12] Further, such a "misunderstanding" by trial counsel would, itself, constitute ineffectiveness given the critical nature of this testimony and trial counsel's failure to seek clarity or confirmation from Dr. Berlin regarding the scope of his possible testimony. *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011) ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.")

The district court attempted to buttress its Opinion by blaming Dr. Berlin's "busy schedule." JA:730. It analogized Dr. Berlin's timeline during the time of Mr. Laureys' trial with that of the 16 months it took him to prepare the report for the evidentiary hearing. JA:731.

The district court's observation overlooks the differing time requirements in a trial versus a remand or § 2255 proceeding—especially the absence of any speedy trial requirements. When undersigned counsel first approached Dr. Berlin about preparing a report, he estimated that because of his obligations to actual trials, he would not be able to prepare a report for *at least* 9 months. [#66] (Motion to Hold Briefing Schedule in Abeyance, based in part on Dr. Berlin's time sensitive professional obligations).

While there was a small additional delay, it was due to unique circumstances related to remuneration that were submitted to the district court in an *ex parte* letter. [#76] (Motion to Continue, citing to the *ex parte* letter). The district court's attempt to compare Dr. Berlin's timeline in a trial context, with a busy federal judge facing Speedy Trial Act constraints with a more leisurely post-appeal remand and § 2255 proceeding was misplaced .

More significantly, the trial court was willing to continue Mr. Laureys' trial if trial counsel could provide any "letter, affidavit, or other formal undertaking from this psychiatrist that he believes that there is such thing as internet sexual

41

compulsive… and that a person having such a condition may well be incapable of forming the requisite specific intent… and that his problem is that he doesn't have the time to decide whether Mr. Laureys fits that model."  JA:103, Tr.4/7/2010:103. But by then trial counsel was well aware of the fact that Dr. Berlin was not concurring with counsel's novel "defense."  The only reason that Mr. Laureys' trial was not continued was because Dr. Berlin was unable to support the diminished capacity defense.

While the district court correctly noted that trial counsel provided material to Dr. Berlin,[13] it unfortunately ignores what trial counsel asked Dr. Berlin to do with the material—to prepare a report that would support the much-vaunted diminished capacity defense.  JA:370, April 7, 2010 letter from trial counsel.  At the evidentiary hearing, both Dr. Berlin and trial counsel testified to this.  JA:631, Tr.12/16/14:125.

On cross, trial counsel attempted to retreat from this position, but he could point to no specific communication where he requested any assistance from Dr. Berlin other than to support the "diminished capacity" defense.  By only seeking Dr. Berlin's potential testimony for counsel's fictional diagnosis, trial counsel essentially precluded his providing any of the critical testimony necessary to

---

[13] The district court Opinion asserts that Dr. Berlin accepted compensation for his services (JA:730), but there is nothing in the record to suggest that he was compensated.

42

explain Laureys' mental disease and thereby fell below the standard of reasonable care.

### 2.    Prejudicial Effect of Failure to Call Dr. Berlin

The district court also opined that trial counsel's failure to call Dr. Berlin was not prejudicial because it would have "done Laureys more harm than good." For support, the district court relies on Judge Henderson's dissent in Mr. Laureys' first appeal.  JA:731.  In that dissent, Judge Henderson states it is difficult to "fathom how [Dr.] Berlin's proposed testimony could have possibly aided Laureys'[] case." *Laureys*, 653 F.3d at 36.

Judge Henderson's dissent, however, was based on Dr. Berlin's potential testimony that Mr. Laureys was a paraphiliac with "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving… children or other nonconsenting persons." *Id*.  This potential testimony was advanced in Mr. Laureys' initial appeal, before any report from Dr. Berlin was actually obtained.  It is also markedly different from the testimony that Dr. Berlin ultimately provided. Judge Henderson's dissent also incorrectly assumes Mr. Laureys' testimony would have been the same had Dr. Berlin testified.

Had Dr. Berlin testified, Mr. Laureys' trial would have been radically different.  First, Dr. Berlin would have provided the jury with a thoughtful explanation of what—for most people—is a foreign and uncomfortable topic.  This

43

Court has recognized how even general clinical testimony can be helpful in explaining these concepts to a jury. *Hite*, 769 F.3d at 1170. Moreover, Dr. Berlin could have provided the jury with scientific evidence from which it could view the defendant's conduct and draw conclusions about his intent. The crux of the defense was that Mr. Laureys was going to meet with Detective Palchak to "perv out." Detective Palchak's testimony ruled this out as a possibility because, for instance, Mr. Laureys did not disclose "up front" that he was into fantasy. Dr. Berlin, a trained psychiatrist and legitimate expert in this area, would have rebutted Detective Palchak's conclusion and thereby opened the door for the jury to consider Mr. Laureys' defense. Given the dearth of evidence that Mr. Laureys anticipated that any minor was going to be at the meeting,[14] this potential testimony would have been highly significant.

The weight of Dr. Berlin's potential testimony is further supported by the opinions of both Judges Brown and Robertson and the impact of the testimony in the *Beachamp-Perez* cases. Both judges questioned the strength of the evidence in the case. In denying Mr. Laureys' Rule 29 motion, Judge Robertson stated, "[a]s

---

[14] Unlike most other sting operation cases, there was no specification that the minor child would be present at the meeting. She did not live with "Jim P." and there was no indication that she would be coming over. Even if Mr. Laureys believed that at some point he might have been able to meet the girl, nothing in the record suggests that he believed she would be there on the day of the meeting— thus, Mr. Laureys could not have been traveling with the intent to engage in illicit sex.

for the interstate travel with the intent count, again, I think there is -- if I were a juror, I would probably find a reasonable doubt as to whether the defendant thought there was going to be a girl in that apartment or not, or whether he was just going to check out the bank, as [trial counsel] indicated." JA:246, Tr.5/26/10:287.[15] Judge Brown found that "the evidence is insufficient as a matter of law, because it cannot possibly prove Laureys intended to have sex with anyone but Jim during the relevant trip.  Even if Laureys entertained some hope that he might have sex with a child in the future, his drive to meet with Jim was at best 'mere preparation' for a future crime." *Laureys*, 653 F.3d at 45, citing *United States v. Bolden*, 514 F.2d 1301, 1307 n.10 (D.C. Cir. 1975) ("'[C]asing' [a] store preparatory to a later attempt to rob" would be "mere preparation" for the robbery, not "an indictable attempt.").  Where both Judge Robertson and Judge Brown noticed glaring deficiencies in the evidence, Dr. Berlin's testimony would surely have been significant.

Finally, the district court dismisses as "presumptive" Mr. Laureys' claim that Dr. Berlin's testimony would have obviated the need to rely on his own testimony for explanations of pedophilia and fantasy chat.  JA:733.  First, the district court mischaracterizes Mr. Laureys' argument.  Mr. Laureys has never

---

[15] Trial counsel had argued that Mr. Laureys was simply going to meet up with Detective Palachak as a preliminary meeting, "similar to casing the bank" before robbing it.  JA:239, Tr.5/26/10:280.  Judge Robertson's comment about the "bank" was in reference to this analogy.

claimed that Dr. Berlin's testimony would have convinced him "not to exercise his right to testify." *Id*. Rather, it would have allowed trial counsel to narrow the scope of that direct examination because there would have been no need to rely on Mr. Laureys for general clinical testimony. At a February 2010 pretrial conference, trial counsel suggested a more limited scope for Mr. Laureys' testimony if Dr. Berlin testified:

> Mr. Laureys will testify as to his mental state. It would obviously be a much stronger defense with a professional opinion that supports – I mean, he doesn't know what's going on in his head. He can only describe what's there. Dr. Berlin can hopefully tell us what it means.

JA:76-77, Tr.2/1/10:4-5. Had Dr. Berlin testified, much of this disturbing testimony would likely have been eliminated from the trial because somebody else would have provided it.

As noted by Judges Brown and Robertson, this close case turned upon the defendant's intent in traveling to meet Detective Palchak. Although Dr. Berlin could not have opined on Mr. Laureys' intent, he would have provided the jury "with information that might not ordinarily be known to a layperson, in order to assist that 'trier of fact' in making a more fully informed decision." JA:737, Berlin Report at 3. His testimony would have given the jury a wholly different perspective on Mr. Laureys' conduct than either Detective Palchak or Mr. Laureys provided. At trial, there was no defense expert to help the jury understand how

Mr. Laureys could be a pedophile and *not* have been seeking sex with an actual child.

Given the potential weight of Dr. Berlin's testimony as both clinical testimony and rebuttal testimony, its potential impact on Mr. Laureys' testimony, and the recognized weakness of the evidence against Mr. Laureys, there is reasonable probability that at least one juror would have found Mr. Laureys not guilty.  *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (prejudice test under *Strickland* is whether "there is a reasonable probability that at least one juror would have struck a different balance").

**C.    Trial counsel was ineffective in failing to submit a shred of corroborating evidence about the meaning of a critical term, "perv out."**

**1.    Failure to Call Dr. Butters Was Deficient**

The district court's Opinion indicates some confusion regarding Mr. Laureys' ineffectiveness claim with regard to Dr. Butters.  It is not simply that trial counsel should have called a linguist but, rather, he should have introduced some corroborating evidence regarding the definition of the term, "perv out," as it was vital to Mr. Laureys' defense.

The district court properly notes that "the primary purpose of [Dr. Butters'] testimony [was] to buttress Dr. Berlin's conclusions and potentially to rebut the government's argument or evidence refuting Dr. Berlin's testimony, not to establish new ineffectiveness claims," but its observation that Mr. Laureys

47

"actually appears to be raising a separate issue of a failure to call a linguistic expert," similar to Mr. Laureys' argument regarding the two "jailhouse witnesses" was incorrect.  JA:729.  Mr. Laureys' claim was that trial counsel "unreasonably failed to investigate *other corroborating evidence*."  [#82-1 at 36], [#127 at 2] (emphasis added).  Dr. Butters' testimony represented part of a larger body of corroborating evidence—including several affidavits and Dr. Berlin's opinion— regarding the meaning of the term "perv out."  Dr. Butters' definition that the term "describes the process of two adults, usually males, getting together in private to engage in sexual fantasies of various sorts, which could mean watching videos, it could mean telling each other lascivious stories… [it could include] [a]lmost anything that one could imagine that might be a sexual fetish or a sexual practice" (JA:430, Tr.12/5/14:18) also rebutted Detective Palchak's testimony that the term had "no particular meaning" (JA:28-29, Tr.11/20/08:13-14) and his later testimony that it was a "general term that means to do sexual things, basically…  It's kind of general."  JA:151, Tr.5/25/10:163.

Trial counsel appreciated the term's significance and had been anticipating his need to provide corroborating evidence as to the meaning of the term "perv out" since, at least, October 2009.  Yet, similar to his proposed mental health testimony, trial counsel dropped the ball and relied solely on Mr. Laureys.  His failure to obtain any corroborating evidence fell below the standard of care.  *See*

48

*e.g., United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986) ("the complete failure to investigate potentially corroborating witnesses… can hardly be considered a tactical decision").

### 2. Prejudicial Effect of Failure to Call Dr. Butters

The district court also improperly held that Dr. Butters' testimony was "not founded on any level of expertise regarding the specific term in question on which the Court...could rely" and, therefore, trial counsel could not be deemed ineffective for his failure to call him. The district court dismissed Dr. Butters' research as limited to "internet searches and a review of exhibits in this case." JA:729. It also dinged him for never having met with Mr. Laureys and for having no "personal experience" with the term "perv out." JA:730.

In brushing off Dr. Butters, the district court unjustifiably ignores his considerable expertise and well-accepted methodologies. As set forth in the evidentiary hearing and Notice of Expert Proffer, Dr. Butters has over 25 years of linguistics experience and is a Professor Emeritus of English and Cultural Anthropology at Duke University, where he served as Chair of both the English Department and Linguistics Program. JA:482. Even the government at the evidentiary hearing did not object to Dr. Butters' qualifications as an expert. JA:418, Tr.12/5/14:6.

49

The court's rebuke of Dr. Butters' internet usage is archaic.  Dr. Butters' methodologies were completely in line with corpus linguistics—the study of language as expressed in corpora (samples) of "real world" text.  A growing number of courts are relying on corpus linguistics for guidance in considering evidence and statutory interpretation.  *See e.g.*, *People v. Harris*, Nos. 149872, 149873, 150042, 2016 Mich. LEXIS 1125 (June 22, 2016) (relying upon the Corpus of Contemporary American English (COCA) to determine the meaning of a word); *see also State v. Rasabout*, 2015 Utah 72, ¶¶ 40-134; 356 P3d 1258 (2015) (Lee, A.C.J., concurring in part) (assessing the strengths and constraints of using a corpus to aid the judiciary's interpretive processes).  Searching the corpus includes looking to internet sources such as "Urban Dictionary," especially for slang terms that may not be in standard sources.  Leslie Kaufman, *For the Word on the Street, Courts Call Up an Online Witness*, N.Y. TIMES (May 20, 2013), http://www.nytimes.com/2013/05/21/business/media/urban-dictionary-finds-a-place-in-the-courtroom.html?_r=0.  As Dr. Butters stated in court, his methods were not simply internet searching—he looked at works of established lexicographers, isolated uses of the term in different contexts, and then compiled the relevant uses he found in the "corpus."  JA:426, Tr.12/5/14:14.  Where an exhaustive internet search is undertaken by a credible expert, there is no reason that the search results should be dismissed.

50

Dr. Butters is a world-renowned linguistics expert whose methodologies and expertise have been relied upon by the hundred-plus peer reviewed journals who have published his work and the thousands of students and academicians who have attended his lectures and courses—surely the district court could have relied on his expertise, as well.

In this very close case, the absence of any corroborating evidence as to the definition of the term "perv out" prejudiced Mr. Laureys.

**D.  Trial counsel was ineffective in failing to object to the § 2422(b) jury instruction where there was no controlling precedent in this Circuit and where the judge had expressly questioned the government's interpretation of the statute.**

Brandon Laureys was convicted under a jury instruction that has been rendered unlawful by this Court.  *See United States v. Hite*, 769 F.3d 1154, 1170 (D.C. Cir. 2014).  The district court's denial of Mr. Laureys' claim that counsel was ineffective for failing to object to an improper jury instruction omits two critical parts of Mr. Laureys' claim—that the jury instruction in Mr. Laureys' case broadened the scope of the statute and that counsel was ineffective for failing to object to an instruction *after Judge Robertson himself questioned the statute*.

First, the unlawful jury instruction expanded the reach of § 2422(b) beyond the statute's intention.  Explaining the instruction to the jury, the government stated, "you must find that the defendant attempted to entice, persuade, induce the person who has control of the child, the person who has access to the child, so that

51

you – not necessarily on that day, on any day – can have sexual contact with the child." JA:318a, Tr.5/26/10:390. This instruction effectively told the jury that Mr. Laureys could be liable under § 2422(b) for attempting to persuade an adult who may or may not have control over a minor to possibly arrange for a sexual meet-up with the child at some undetermined point in the future.

The district court's Opinion seems to suggest that there was no way for trial counsel to anticipate the legal standard ultimately articulated in *Hite.*[16] This district court further suggested that Mr. Laureys' only support for his argument challenging the § 2422(b) jury instruction was Judge Brown's *sua sponte* partial dissent.[17] This, however, was *not* what Mr. Laureys argued.

From the beginning of the remand proceeding, Mr. Laureys has stated that trial counsel was ineffective for failing to object to a jury instruction that "broadened the scope" of § 2422(b) "beyond precedent in this Circuit or any other circuit" and that was based on a statutory interpretation that was questioned by Judge Robertson. Motion for New Trial [#82-1 at 48]. Mr. Laureys argued that the lawful interpretation—one that was supported by the law in the District Columbia and in several circuit courts—was one where communications made to an adult intermediary are intended to reach the child. [#82-1 at 44-45]. (citing

---

[16] "The Constitution does not require defense counsel to be legal prognosticators." JA:728-29.

[17] "For support, Laureys cites a dissent from his 2011 appeal..." JA:728.

cases from the Eighth Circuit, Third Circuit, Fifth Circuit, First Circuit and the

District of Columbia district courts).[18]  Much of this legal authority existed at the

time of Mr. Laureys' trial and there is no reason why trial counsel did not present

this to Judge Robertson.

Furthermore, District of Columbia cases that were decided after Mr.

Laureys' trial provide additional support for the proposition that the *Murrell*

court's interpretation of § 2422(b) was flawed and should have been challenged by

trial counsel.  For example, a District of Columbia district court in *Hite* (pre-

appeal) interpreted § 2422(b) in a manner which was much more narrow than the

one articulated in *Murrell.*  In that opinion, the district court recognized the varying

interpretations for application of the statute in adult intermediary cases as either (1)

---

[18] *United States v. Caudill*, 2013 WL 610492 at *3. No. 12-10292 1 (5th Cir. Feb 19. 2013) (imposing *§ 2422(b)* liability upon a defendant who "sought confirmation that the [minor] girls would engage in sexual intercourse... and agreed to pay their caretaker one hundred dollars to take them to a hotel for the contemplated encounter" and then traveled to the meet the girls with $100, condoms, and diapers) (emphasis added); *United States v. Berk*, 652 F.3d 132,140 (1st Cir. 2011) ("Section 2422(b) criminalizes an intentional attempt to achieve a mental state - a minor's assent"); *United States* v. *Nestor*, 574 F.3d 159, 161-62 (3d Cir. 2009) (finding that the defendant attempted to violate § 2422(b) where he communicated with the purported stepfather of a child to arrange for sex with the child at a specified time and in a specified location, discussed ways to avoid police detection, and asked the stepfather to bring child pornography); *United States v. Spin-lock*, 495 F.3d 1011, 1014 (8th Cir. 2007) (holding that a defendant violated § 2422(b) where he communicated with the purported mother of two young girls, asked her to communicate his suggested sex acts to her daughters, and "relied upon [the mother's] influence and control over her daughters, asking her to instruct the girls not to tell anyone what he planned to do to them").

"that the defendant must manifest some desire that the adult interact with the purported child on the defendant's behalf with respect to sexual activities" or, according to the *"narrower reading,"* (2) "that the defendant took a substantial step in attempting to arrange a sexual encounter between the defendant and the child."  Memorandum and Order at 9-11, [#6] *United States v. Hite*, 12-cr-065 (CKK) (D.D.C. March 9, 2012) (Lamberth, J.) (emphasis added).  The district court's Opinion does not address the abundance of case law that Mr. Laureys provided in support of his § 2422(b) jury instruction claim—including cases that were decided years before the *Hite* opinion issued.

While the language of the statute and the existing court opinions would be sufficient to render trial counsel's failure to object below the standard expected of a reasonably competent defense attorney, the most compelling fact—and one that is overlooked by the district court's opinion—is that Judge Robertson *sua sponte* informed trial counsel that the government's interpretation of the statute was strained.  Judge Robertson's statements put on the record his "discomfort with the statute" and his view that the "way the language has to be parsed and chopped and sliced and diced in order to make everything fit is frankly quite disturbing to [him]."  JA:245, Tr.5/26/10:286.  He also expressly stated that *Murrell* had no equivalent in this Circuit and was, therefore, not the law.  *Id.*  Given Judge Robertson's invitation to challenge the statute, there was no "prognostication"

required by trial counsel. Judge Robertson's prescience and his remarks to trial

counsel rendered prognosticating unnecessary. When the trial court tells defense

counsel that the court has a problem with the elements of the offense as set forth in

the jury instruction, and that the case the government is relying upon is not the law

in this Circuit, it is not asking too much from trial counsel to object to that

instruction.

Given Mr. Laureys' emphasis on Judge Robertson's misgivings, it is clear

that he never argued that trial counsel should have been a psychic—he simply

argued that trial counsel should have heeded Judge Robertson's reservations about

the statute, looked into other interpretations, and preserved the jury instruction

objection. Because trial counsel failed to object to an improper jury instruction

that was not supported by the case law and was based on a statutory interpretation

expressly questioned by the judge, he was ineffective and Mr. Laureys' Sixth

Amendment right to counsel was denied.[19]

---

[19] Although *Hite* was decided after the filing of the § 2255 Motion to Vacate, counsel for Mr. Laureys raised with the Court the fact that the holding had further implications with regard to the § 2422(b) conviction in this case. JA:417, Tr.12/5/14:5. In addition to the ineffective assistance of counsel argument raised above with regard to the jury instruction, the decision in *Hite* provides an independent ground for vacating Mr. Laureys' conviction because it means that the trial court applied an incorrect standard in denying Mr. Laureys' Rule 29 motion. Given the holding in *Hite*, the trial court should have dismissed the § 2422(b) claim because, as trial counsel argued, "[a]ll of the inducement comes from the detective. The detective induces Mr. Laureys to participate, and Mr. Laureys seemingly agrees, but Mr. Laureys does not use any type of persuasion or

## CONCLUSION

For these reasons, Mr. Laureys' convictions should be vacated and the case should be remanded for a new trial.

Dated: August 1, 2016                Respectfully submitted,

/s/ L. Barrett Boss
L. Barrett Boss
bboss@cozen.com
S. Rebecca Brodey
COZEN O'CONNOR
1200 19th Street, NW, 3rd Floor
Washington, DC  20036
(202) 912-4818

*Counsel for Appellant*

---

argument with the detective concerning specific sexual activity with the child."
JA:239, Tr.5/26/10:280.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,069*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>August 1, 2016</u>       <u>/s/ L. Barrett Boss</u>
                                  *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of August, 2016, I caused this

Corrected Brief of Appellant to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to

the following registered CM/ECF users:

> Suzanne G. Curt
> Elizabeth Trosman
> U.S. Attorney's Office
> 555 4th Street, NW
> Washington, DC  20530
>
> *Counsel for Appellee*

I further certify that I caused the required copies of the Corrected

Brief of Appellant to be hand filed with the Clerk of the Court.


> /s/ L. Barrett Boss
> *Counsel for Appellant*

# **ADDENDUM**

## <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

U.S. Const. AMEND. VI .........................................................................Add. 1

18 U.S.C. § 2422(b) ..............................................................................Add. 1

18 U.S.C. § 2423(b) ..............................................................................Add. 1

18 U.S.C. § 2260A ................................................................................Add. 2

28 U.S.C. § 2255(a) ..............................................................................Add. 2

## CONSTITUTIONAL PROVISIONS AND STATUTES

The relevant statutes and rules are:

Sixth Amendment, which provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

18 U.S.C. § 2422(b), which provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2423(b), which provides:

> A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2260A, which provides:

> Whoever, being required by Federal or other law to register as a sex
> offender, commits a felony offense involving a minor under section… 2422,
> 2423, or 2425, shall be sentenced to a term of imprisonment of 10 years in
> addition to the imprisonment imposed for the offense under that provision.
> The sentence imposed under this section shall be consecutive to any
> sentence imposed for the offense under that provision.

28 U.S.C. § 2255(a), which provides:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the sentence
> was imposed in violation of the Constitution or laws of the United States, or
> that the court was without jurisdiction to impose such sentence, or that the
> sentence was in excess of the maximum authorized by law, or is otherwise
> subject to collateral attack, may move the court which imposed the sentence
> to vacate, set aside or correct the sentence.